**Bennie LENARD, Plaintiff-Appellee, Cross-Appellant,**

**v.**

**Robert ARGENTO & Joseph Sansone, Defendants-Appellants,**

**v.**

**VILLAGE OF MELROSE PARK, Defendant-Appellee.**

**Nos. 80–2602, 80–2666, 81–2036 and 81–2434.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 10, 1981.

Decided Feb. 1, 1983.

As Modified Feb. 15, 1983.

Rehearing Denied March 10, 1983.

John G. Poust and Stephen E. Sward, Rooks, Pitts, Fullagar & Poust, Frank Glazer, Chicago, Ill., for defendants.

Cecile Singer and Edward T. Stein, Singer & Stein, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before PELL, Circuit Judge, CUDAHY, Circuit Judge, and GRANT,* Senior District Judge.

GRANT, Senior District Judge.

This case arises from the events of January 31, 1977 involving plaintiff-appellee, Bennie Lenard, and several police officers of the Village of Melrose Park, Illinois. The particular events of the case are disputed but we will attempt to provide a fair summary of the facts.

Lenard, a 41 year old black mechanic, discovered when he left work at 7:00 A.M. on January 31 that his car had a flat tire. While waiting for the spare tire to be repaired, he and a co-worker went to a neighborhood bar where Lenard consumed two shots of vodka and two glasses of beer. After changing the tire, Lenard returned to the bar where he consumed in a 2 to 2½ hour period two more shots of vodka and three glasses of beer. He had nothing to eat during this time. About 1:00 P.M., Lenard and his co-worker left the bar to go to the co-worker's home, each driving his own vehicle. While en route, Lenard collided with a car driven by Andrea Dreyer, a defendant in the district court trial but not a party in this appeal. There is a dispute whether Lenard's car crossed the center line and struck Dreyer's vehicle.

The damage to each car was minor but the drivers quarreled regarding fault. Dreyer, in her deposition, admitted shouting vulgarities at Lenard. Witnesses, including a passenger in the Dreyer car, testified Lenard appeared drunk and that he struck Dreyer's shoulder with his fist and grabbed her. The Melrose Park police were called with Officer Joseph Sansone the first to arrive at the accident scene. Officer Robert Argento arrived several minutes later.

Lenard was arrested for drunk driving and several other traffic offenses. A scuffle occurred while the officers tried to handcuff Lenard and place him in Argento's squad car. Lenard contends he was beaten by Argento with his nightstick while in the squad car and knocked unconscious. Argento searched Lenard's car after the arrest and discovered a handgun and an open half can of beer.

After his arrest, Argento drove Lenard to the Melrose Park police station where Lenard contends he was further kicked, beaten and called a "black nigger." His next memory is that of lying on the wet floor of a cell in his underwear in extreme pain and cold. He requested to go to a hospital but someone said: "Leave him alone. He doesn't want to go to the hospital." Lenard was unable to identify any of the officers because of his facial injuries. Lenard remained in custody at the Melrose Park police station until late that evening. During the evening while Lenard was still in a cell in the Melrose Park police station, Floydell Henning (Lenard's stepson) testified he heard racial slurs, i.e., "Chicken George," over the loudspeaker in the station. He could not identify the parties involved. At one point while still in police custody, Lenard was brought to the Westlake Community Hospital where he was treated for his injuries and returned to the police. Lenard complains that his family came to the jail on three occasions that evening before his release was finally obtained. Lenard was hospitalized for his injuries for 39 days and later underwent surgery for the injuries. There was medical testimony at trial that he suffered permanent sight impairment from his injuries.

Officers Argento and Sansone deny that Lenard was beaten at any time with clubs or anything else. Two witnesses present at the accident scene testified that they did not see Lenard beaten. The police contend that an altercation occurred in the icy police station parking lot while attempting to remove Lenard from the squad car. Because of his size (6'3", 260 pounds) and drunken condition, three officers, Argento, Culotta and Zito, were necessary to remove him from the car. The officers testified that Lenard swore at them and resisted being taken into the police station. The officers

---

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

further contend that Lenard repeatedly fell in the icy lot and on the stairway of the station because of his constant struggling. They deny that any beating occurred and maintained Lenard's injuries occurred while resisting his removal into the police station.

Lenard was charged with the following state offenses: driving while under the influence of intoxicating beverage; improper traffic lane usage; failure to reduce speed to avoid an accident; battery; transportation or possession of alcoholic liquor; possession of a firearm without a firearm identification card; unlawful transportation or use of weapons; resisting a police officer and driving without a valid driver's license.

A jury convicted Lenard of the petty offense of transportation of alcoholic liquor, Ill.Rev.Stat.1977, Ch. 95½, par. 11–502, and acquitted him on all other charges. The transportation conviction was subsequently reversed and remanded by the Illinois Appellate Court because of the trial court's refusal to allow Lenard to cross-examine the police officers for impeachment purposes. *People v. Lenard,* 79 Ill.App.3d 1046, 35 Ill.Dec. 104, 398 N.E.2d 1054 (1979). In dicta, however, the court did state that "[t]he evidence adduced was ample to sustain defendant's conviction." *Id.* 35 Ill.Dec. at 108, 398 N.E.2d at 1058.

Lenard initiated this action in a five-count complaint pursuant to several sections of the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985 and 1988. The named defendants included the Village of Melrose Park, Robert Argento, Joseph Sansone, Bruce Culotta, George Zito, Andrea Dreyer, Dr. T. Mehrpuyan and Westlake Community Hospital. Westlake Hospital and Dr. Mehrpuyan reached a settlement with Lenard and they, along with Count IV of the Complaint, were dismissed from the suit. Count I of the Second Amended Complaint charged Police Officers Argento, Sansone, Culotta and Zito with violating 42 U.S.C. § 1983[1] by beating Lenard. Count II charged these same officers with conspiracy to deprive equal protection of the law by use of brutal and excessive force on Lenard in violation of 42 U.S.C. § 1985(3)[2] and the Village of Melrose Park for failure to properly screen, hire, train and supervise its police employees in violation of 42 U.S.C. §§ 1983 and 1985. Count III charged conspiracy to impede, obstruct and defeat the due course of justice with intent to deny equal protection in violation of 42 U.S.C. § 1985(2).[3] So charged under Count III

1. 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. 42 U.S.C. § 1985(3) provides:
 (3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or

advocacy in a legal manner, toward or in favor of the election of any lawfully qualified persons as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

3. 42 U.S.C. § 1985(2) provides:
 (2) If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his

were the Village of Melrose Park, Argento, Sansone, Culotta, Zito, Dreyer, Westlake Community Hospital and Dr. T. Mehrpuyan (the latter two were dismissed before trial). Count V charged Argento, Sansone and Dreyer with malicious prosecution for the charges resulting from the traffic accident and arrest, thereby depriving Lenard of his civil rights under 42 U.S.C. § 1983.

Bifurcated trials lasting five weeks were held on liability and damages in February and March, 1980. A default judgment was entered against defendant Dreyer. In the liability phase of the trial, the jury returned a verdict for all the defendants on the "beating" charge of Count I. However, the jury found for Lenard on the two conspiracy charges of Counts II and III and the malicious prosecution charge of Count V against Argento and Sansone only. In the damage portion of the trial, Lenard was prohibited from presenting any damages resulting from the "beating" because the jury found no "beating" under Count I.[4] No other evidence of damages was presented by Lenard. Over defense objection, the jury was given a three-tier jury verdict form by the trial judge and instructions relating to possible damages under that form. The jury returned a finding of $10,000 actual and compensatory damages, $125,000 "substantial damages" and $150,000 punitive damages against Argento and $75,000 punitive damages against Sansone.

The Village of Melrose Park, Argento and Sansone raise four issues on this appeal. First, whether the district court's use of a three-tier damage verdict form and its damage instructions which stressed "substantial damages" were erroneous. Second, whether the amount of damages awarded by the jury is against the manifest weight of evidence and excessive as a matter of law. Third, whether there was ample evidence to establish a good faith belief in the officers for probable cause to arrest Lenard and prosecute the criminal charges requiring a directed verdict for the defendants on the malicious prosecution charge of Count V. Fourth, whether a conspiracy without an overt act can be the basis of a damage award or whether there can be a duplication of an award for conspiracy when damages have been already awarded for the act.

On cross-appeal, Lenard raises several issues. First, whether the trial court erred in permitting a good faith immunity defense to be asserted by the Village of Melrose Park. Second, whether the trial court erred in not specifically mentioning Lenard's claim of a beating in its verdict form. Third, whether the jury verdict for the "beating" count was against the manifest weight of the evidence. Claims are also raised regarding attorneys' fees and costs under 42 U.S.C. § 1988, 28 U.S.C. § 1920 and Fed.R.Civ.P. 54(d). Both Lenard and the defendants raise other claims of error, including arguments of various counsel, instructions to the jury and the district court's judgments on Motions in Limine. Each will be addressed individually.

### I. Liability

#### a. Police Officers

Count I of the Second Amended Complaint alleged that the four named police

---

person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce,

the right of any person, or class of persons, to the equal protection of the laws;

4. "THE COURT: To the extent that the proffer relates to injuries dericed [sic] as a result of the incident of 1/31/77, this Court, in light of the jury's verdicts in this case, would preclude a presentation of such evidence, if it relates, as has been described by Mr. Bertucci. And the proffer, of course, may stand and objection to the Court excluding it may stand; and in light of the Court's earlier comments, as well as these, would rule that inadmissible for submission to the jury for consideration in a damage phase of the trial." (Tr. 2308).

882

officers beat Lenard while he was in police custody in violation of his civil rights. This beating was the seminal issue of the entire case. Lenard testified that he was cursed and struck by Argento after he was placed in the backseat of Argento's squad car. Lenard contends that he was struck about his head and right eye with what appeared to be a stick. After being knocked unconscious, Lenard testified his next recollection was that of sitting in the squad car as it pulled up to the police station and hearing Argento tell someone "I got a big Black nigger." He testified that he was grabbed about the neck and pulled from the car. He fell to his knees and was kicked and beaten. Lenard's next memory is that of being in a cold wet cell in his underwear. Lenard could not identify any of the officers involved because of his facial injuries.

Several witnesses at the accident scene testified that they did not see Lenard being beaten. Officers Argento, Zito and Culotta testified Lenard was injured in two falls in the icy parking lot and by a fall on the stairwell in the police station. These officers testified that Lenard was struggling and resisting his removal into the station. His size, drunken condition, his struggling, the physical weather conditions all contributed to the falls. The jury, after hearing all the testimony, returned a verdict that Lenard was not beaten.

While there is clearly a conflict of testimony, the question of credibility and weight of the evidence is within the purview of the jury. *Pinkowski v. Sherman Hotel,* 313 F.2d 190, 193 (7th Cir.1963). A jury verdict cannot be lightly set aside so long as it has a reasonable basis on the record. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); *Wyant v. J.I. Case Co.,* 633 F.2d 1254, 1256 (7th Cir. 1980). Viewing the evidence in a light most favorable to the defendants, the prevailing parties, (*Smith v. Rogers,* 290 F.2d 601, 602 (7th Cir.1961)), there was a reasonable basis in the record for the jury verdict and the evidence will not be reweighed. *Rupe v. Spector Freight Systems, Inc.,* 679 F.2d 685,

697 (7th Cir.1982) (Judge Swygert dissenting); *Musgrave v. Union Carbide Corp.,* 493 F.2d 224, 229 (7th Cir.1974). The jury determination that Lenard was not beaten will not be disturbed.

Counts II and III of the complaint charged the named officers with violation of §§ 1985(2) and (3). The jury found, however, only Argento and Sansone liable for civil rights conspiracy. Argento and Sansone argue that they cannot be liable for a conspiracy to "beat" when the jury found that there was no "beating." However, the charge given to the jury was not a "conspiracy to perform a beating" but rather a conspiracy to deprive [Lenard] due course of justice and equal protection of the law. (Tr. 2202–03).

As this court outlined in *Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980):

A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" *Rotermund v. United States Steel Corp.,* 474 F.2d 1139 (8th Cir.1973) (citation omitted).

\* \* \* \* \* \*

A plaintiff seeking redress need not prove that each participant in a conspiracy knew the "exact limits of the illegal plan or the identity of all participants therein." *Hoffman-LaRoche, Inc., supra,* 447 F.2d [872 (7th Cir.1971)] at 875. An express agreement among all the conspirators is not a necessary element of a civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement, it

simply must be shown that there was "a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences." *Id.*

600 F.2d at 620–21.

Thus, there cannot be a civil cause of action for conspiracy under § 1985 without an overt act. *Williams v. St. Joseph Hospital,* 629 F.2d 448, 451 n. 3 (7th Cir. 1980). "[I]t is the overt act which moves the conspiracy from the area of thought and conversation into action and causes the civil injury and resulting damage." *Hoffman v. Halden,* 268 F.2d 280, 295 (9th Cir. 1959), *overruled in part on other grounds, Cohen v. Norris,* 300 F.2d 24 (9th Cir.1962).

While Sansone's contact with Lenard was primarily at the accident scene, Argento did place Lenard in his police car, drive him to the Melrose Park police station and escort him into the police station. There was testimony at trial that Sansone called Lenard a "shine" to a tow truck driver at the accident scene. Lenard testified that Argento called him a "big Black nigger" and hit him in the right eye and about the face with what appeared to be a stick. While the evidence does not link Argento and Sansone to all the events of January 31, there was sufficient evidence for a jury to reasonably believe that there was an overt act and circumstantial evidence of an agreement among the police, particularly Argento and Sansone, to conspire to deprive Lenard of his civil rights. Furthermore, there was sufficient evidence of racially discriminatory animus to meet the *Griffin* standard for § 1985 conspiracies.

The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by law to all.

*Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1970) (foot-notes omitted) (emphasis in original). *See also Murphy v. Mount Carmel High School,* 543 F.2d 1189, 1192 n. 1 (7th Cir.1976); *Potenze v. Schoessling,* 541 F.2d 670, 672 (7th Cir.1976); *Lesser v. Braniff Airways, Inc.,* 518 F.2d 538, 540 (7th Cir.1975).

While the jury may have found insufficient evidence of a beating, that does not mean that there was insufficient evidence of a § 1985(3) conspiracy. The jury could have found that there was insufficient evidence to tie all the defendants to the alleged beating, yet enough evidence, based primarily upon the injuries sustained by Lenard during his police custody, to reasonably conclude that at least Argento and Sansone had entered into and committed "an act" in the furtherance of a conspiracy to deny equal protection.

As pointed out in *Hoffman-LaRoche, Inc. v. Greenberg,* 447 F.2d 872, 875 (7th Cir.1971):

... [c]ircumstantial evidence may provide adequate proof of conspiracy. The law does not demand proof that each conspirator knew the exact limits of the illegal plan or the identity of all participants therein.

Thus, while the jury determined that the evidence did not support the finding of a beating, there was a determination of sufficient evidence to find a conspiracy to deprive equal protection.

In such a situation, "it is the jury which 'weighs the contradictory evidence and inferences' and draws 'the ultimate conclusion as to the facts.'" [Citing *Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 700–01, 82 S.Ct. 1404, 1411–1412, 8 L.Ed.2d 777 (1962).]

*Hampton v. Hanrahan,* 600 F.2d at 621. From a review of the facts and record in this case, it was not unreasonable for this jury to reach the verdicts regarding Counts I and II.

Count III specifically alleged that the named officers conspired together with the purpose of impeding, obstructing, hindering and defeating the due course of justice and to deprive Lenard of equal protection of the

884

law. This count is complementary to Count V of the Complaint charging malicious prosecution. All parties agree that Count III goes to a conspiracy to maliciously prosecute Lenard for the traffic, liquor and gun violations. In light of our holding regarding the malicious prosecution charge, *infra*, we must reverse the jury verdict on Count III for failure of an act implementing the conspiracy.

█ In his Second Amended Complaint, Lenard charged in Count V that Argento, Sansone and Dreyer denied him his rights to be free from malicious prosecution under color of law in violation of § 1983. This court has held that under a charge of a § 1983 violation, the test is " . . . not whether the arrest was constitutional or unconstitutional or whether it was made with or without probable cause, but whether the officer believed in good faith that the arrest was made with probable cause and whether that belief was reasonable." *Brubaker v. King,* 505 F.2d 534, 536–37 (7th Cir.1974). *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339 (2d Cir.1972), *on remand* from 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[5] *See also Terket v. Lund,* 623 F.2d 29, 31 (7th Cir.1980) (Lack of probable cause and malice must be shown. Actual existence of probable cause is an absolute bar to a § 1983 action); *Boscarino v. Nelson,* 518 F.2d 879 (7th Cir.1975); *Tritsis v. Backer,* 501 F.2d 1021 (7th Cir.1974).

The question then is whether Officers Argento and Sansone arrested Lenard with good faith belief that there was probable cause for the arrest and whether that belief was reasonable. The Supreme Court has held that:

[t]he quantum of information which constitutes probable cause—evidence which would "warrant a man of reasonable caution in the belief" that a felony has been committed, *Carroll v. United States,* 267 U.S. 132, 162 [, 45 S.Ct. 280, 288, 69 L.Ed. 543]—must be measured by the facts of the particular case.

*Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1962). This court has held in *United States v. Ganter,* 436 F.2d 364, 368 (7th Cir.1970), that:

The determination of probable cause does not rest upon a technical framework; instead it depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, [1310–1311], 93 L.Ed. 1879 (1949). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); *Thornton v. Buchmann,* 392 F.2d 870, 872–73 (7th Cir.1968).

*See also United States v. Watson,* 587 F.2d 365, 368 (7th Cir.1978).

█ In examining the particulars of this case, it is undisputed that Lenard consumed four shots of vodka and five glasses of beer in a period of 5–6 hours while eating nothing and that while driving his automobile he became involved in a minor auto accident. Both officers were called to the scene to investigate the accident when a dispute over fault arose. While the offenses did not occur in the presence of the officers, they arrived upon the scene shortly thereafter. Testimony at trial indicated that Dreyer complained that Lenard had crossed

---

5. Therefore, to prevail the police officer need not allege and prove probable cause in the constitutional sense. The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable. And so we hold that it is a defense to allege and prove good faith

and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted. We think, as a matter of constitutional law and as a matter of common sense, a law enforcement officer is entitled to this protection.
456 F.2d at 1348.

the center line and struck her car. Upon the basis of this information and Lenard's appearance at the scene, it would be reasonable for the officers to have a good faith belief that there existed probable cause to arrest Lenard on the traffic violations. While at the scene, Officer Argento, during a search of Lenard's car, discovered the firearm on the seat and the open can of beer. This Court does not lightly set aside this jury verdict but under the facts which were before the officers, we find that there was probable cause for Lenard's arrest for gun possession and liquor possession, and that it was reasonable for Argento and Sansone to have a good faith belief in the probable cause. We reverse the finding of malicious prosecution and the finding of conspiracy to obstruct justice dependent upon this prosecution.

### b. Village of Melrose Park

Count II of the Complaint alleged:

44. Defendant "Village" by its policy and custom of failing to properly screen, hire, train and supervise its police employees encouraged and sanctioned the misbehavior complained of herein, with the knowledge that it would deprive plaintiff of his rights, privileges and immunities, including Equal Protection of the Laws.

(R. 95).

Count III of the Complaint charged that it was the policy of the Village to encourage, sanction and "cover-up" acts of misconduct by its police employees. The count specifically alleges that the internal investigation ordered by the Chief of Police was conducted solely to disprove Lenard's allegations and cover-up the police misconduct. Lenard further alleges that the policy and practice of the Village to encourage, sanction and conceal unlawful acts by its police employees was so broad and pervasive that it encompassed a large number of the police department including the Chief from the time of the incident to the present day.

Liability of municipalities must be based on something more than a mere right to control employees. A "municipali-

ty cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. New York City Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1977). As the Supreme Court held in *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1975), there must be an "affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct." The Court in *Rizzo* further held that the "failure to act in the face of a statistical pattern" of police misconduct was not sufficient to base liability on the City of Philadelphia. 423 U.S. at 376, 96 S.Ct. at 606. In *Monell* there was this same requirement of showing an implementation or execution of a governmental policy before municipal liability could be imposed. The resulting case law from *Rizzo* finds "... that a failure of a supervisory official to supervise, control, or train the offending individual officers is not actionable absent a showing that the official either encouraged the specific incident of misconduct or in some way directly participated in it." *Hays v. Jefferson County, Ky.,* 668 F.2d 869, 874 (6th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers. *Id.* Inaction by the Village officials would also not attach liability. There can be liability only when there is an extremely high degree of culpability for inaction. The Second Circuit has held:

> ... a mere failure by the county to supervise its employees would not be sufficient to hold it liable under § 1983. However, the county could be held liable if the failure to supervise or the lack of a proper training program was so severe as to reach the level of "gross negligence" or "deliberate indifference" to the deprivation of the plaintiff's constitutional rights.

*Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979) (citation omitted). Only where there is a pattern of constitutionally offensive acts with failure to invoke remedial measures will there result in municipal liability for subsequent violations "if the supervisor's inaction amounts to deliberate indifference or tacit authorization of the offensive acts." *Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir. 1980). Until this present case, this court has not addressed these liability holdings of *Monell* or *Rizzo,* though they have been relied upon in *Spriggs v. City of Chicago,* 523 F.Supp. 138, 142 (N.D.Ill.1981) and *Jordon v. City of Chicago, Department of Police,* 505 F.Supp. 1 (N.D.Ill.1980).

■ After an examination of approximately 2400 pages of transcript, we find insufficient evidence to establish a failure by the Village to properly screen, hire, train and supervise its employees. Defendant Argento was a police officer for another community before his employment by Melrose Park. He and Sansone attended the Chicago Police Academy after employment. While Chief of Police Cimino had received no formal police training, he was a veteran of thirty years on the police force. Chief Cimino, during direct examination, testified that his officers did receive training on physical restraint of prisoners. The identity of those officers was not pursued by Lenard's counsel. Several other officers, including defendants Culotta and Zito, testified but were not questioned by Lenard regarding their police training.

The Village of Melrose Park did not have established at the time of this incident a system of internal investigation nor written regulations regarding treatment of prisoners or the use of nightsticks. Directions, department policy and instructions were transmitted by word of mouth via meetings with staff officers every three months or general whole department meetings held twice a year. Nightsticks are issued to the officers only one week a year during a community feast and returned to the department at the end of that week. They were not standard uniform equipment requiring continual retraining.

Chief Cimino testified that on several occasions over eleven years the FBI had questioned officers regarding complaints but nothing ever became of those incidents. When a citizen complaint came to the attention of the Chief, he looked into the matter and talked the matter out with the officer and the complainant. For a small community, this personal approach to a community problem seems reasonable. The internal investigation regarding the Lenard incident was the first that Chief Cimino felt a need to order. The investigation was conducted by Officer Carpino and no disciplinary action resulted from this investigation. The investigation was still open at the time of trial.

Lenard argues that the investigation was conducted to disprove his allegations and cover-up police misconduct. We found no evidence to support these allegations. Officer Carpino did read at trial from a police report one line of which read "disprove allegation by the defendant and Lenard was charged with DWI" (Tr. 1295). However, when asked what was the purpose of the investigation, Carpino's reply was "to corroborate or contradict any of the evidence, whichever it may be, regardless to where it led." (Tr. 1297).

In light of the standard outlined in *Monell, supra, Rizzo, supra* and *Turpin, supra,* the review of the evidence in this case clearly did not reveal sufficient evidence that a reasonable man would return a contrary verdict regarding Count II or Count III in regard to the Village of Melrose Park. Most definitely the evidence did not rise to the standard of liability necessary under *Rizzo* and its progeny.

■ Similarly, there was not sufficient evidence to show a conspiracy on the part of the Village or its officials with the police officers or defendant Dreyer. The evidence did not show a custom or practice upon the part of the Village or through its officials with its police officers to deprive certain citizens of their constitutional rights through the use of physical force or crimi-

nal prosecution. From a reading of Andrea Dreyer's deposition entered into the record at trial, she had four contacts with the Melrose Park police—the day of the accident, the following day when she filed a battery complaint and two telephone conversations after Lenard filed suit. The only possible conspiracy would have been in regard to the accident report and the battery charge. But there was no reasonable basis for the Village to have refused to pursue the complaints of a citizen relating to this accident or the battery charge filed. There was no evidence to show that the Village provoked the complaint filed by Dreyer.

The presence of the Village attorney during an interview of Argento, Sansone and Culotta by State's Attorney Kling on February 14, 1977 and the Village attorney's restrictions upon that interview, appear to be no more than legal counseling of Village employees during an admittedly unofficial investigation rather than a cover-up. The Village cooperated with the State's Attorney's office providing statements in its possession. The officers even took Kling to the accident scene and reviewed the events with him. Before a complaint was filed by Lenard and on the basis of newspaper articles alone, Chief Cimino initiated the first internal investigation of police officers in Melrose Park. While Lenard chooses to see conspiracy in these activities, we see none.

■ It should be pointed out that Lenard argues on appeal that the trial court erred when it instructed the jury regarding good faith immunity defense accorded the Village. At the time this trial was conducted, municipalities possessed a qualified immunity under *Monell v. New York, supra,* though the trial court was aware of pending action in the Supreme Court on this issue. (Tr. 1739–40, 1743). Six weeks after the conclusion of the trial, the Supreme Court held municipalities have no immunity from liability under 42 U.S.C. § 1983 for their constitutional violations, and that they

may not assert the good faith of their officers as a defense. *Owens v. City of Independence, Mo.,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). On appellate review, we would ordinarily be obligated to apply the law as of the time of the appeal versus as of the time of trial, *National Labor Relations Board v. Food Store Employees Union, Local 347,* 417 U.S. 1, 10 n. 10, 94 S.Ct. 2074, 2080 n. 10, 40 L.Ed.2d 612 (1974); *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Key v. Rutherford,* 645 F.2d 880, 883 (10th Cir. 1981), but we need not address the issue of the jury instruction in this case.

At the close of Lenard's case and at the close of all the evidence, the Village moved for a Directed Verdict which was reserved by the district court. The jury then returned verdicts in favor of the Village as to all alleged violations. Notwithstanding the jury verdict, after the close of the trial, the district court granted the Village's Motion for a Directed Verdict effective as of the close of the evidence. (Corrected Judgment was entered October 3, 1980 [R. 277]).[6] Thus, the issue on appeal is not whether trial court erred when it instructed the jury on the Village's good faith immunity defense but whether the court erred in granting a Directed Verdict in favor of the Village. The Directed Verdict took the judgment from the jury and made it that of the court.

The standard for a Directed Verdict was recently stated by this Court in *Richardson v. City of Indianapolis,* 658 F.2d 494, 498 (7th Cir.1981). It was stated that:

... the trial judge must determine whether the party with the burden of proof has produced sufficient evidence upon which a jury could properly proceed to a verdict, and that a mere scintilla of evidence will not suffice. *Hohmann v. Packard Instrument Co.,* 471 F.2d 815, 819 (7th Cir.1973). Thus on appeal the

---

6. "Today the court has amended its Judgment dated March 19, 1980 which mistakenly entered judgment upon the jury's verdict in favor of the Village of Melrose Park and has entered judgment on its order granting the motion of the Village of Melrose Park for a directed verdict at the close of all the evidence." Footnote to Memorandum Opinion October 3, 1980. (R. 281).

party against whom a verdict has been directed has the onus of demonstrating the existence of a conflict in the evidence or the inferences to be drawn therefrom sufficient to justify submission of the question to the jury. *Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.,* 483 F.2d 1098, 1102 (5th Cir. 1973).

 While it might be argued that the trial court could have been influenced in its judgment by the defense of qualified immunity, such an argument would not reverse the trial court's decision but only require a remand for a clarification of its decision. In the normal orderly and efficient administration of justice, priority consideration should be given to issues which will dispose of litigation over issues which, if sustained, will require remand and retrial. *Otten v. Stonewall Insurance Co.,* 538 F.2d 210, 213 (8th Cir.1976). From this record, we feel a remand is not necessary.

 Lenard argues the sufficiency of the evidence against the Village and requested a reversal of the verdict and judgment, but no post-trial motions, *i.e.,* judgment n.o.v. or motion for retrial, were made. Such failure limits the relief available from the appellate court to that of possibly ordering a new trial. *Cone v. West Virginia Pulp and Paper Co.,* 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947); 5A Moore's Federal Practice ¶ 50.12 (2d ed. 1981). Defendants Argento and Sansone made several post-trial motions, including a motion for new trial. These motions were denied. From our review of the record, we fail to find sufficient evidence that would cause a reasonable man to return a contrary verdict. *Smith v. J.C. Penney Co.,* 261 F.2d 218, 219 (7th Cir.1958). We sustain the Directed Verdict for the Village of Melrose Park.

## II. Damages

### a. "Substantial"

As previously discussed, all the defendants, the Village of Melrose Park, Argento, Sansone, Zito and Culotta, were found not guilty by the jury of the alleged beating of Lenard. The jury also found the Village of Melrose Park, Zito and Culotta not guilty under Counts II and III. The jury did, however, find for Lenard against Argento and Sansone on both Counts II and III. The jury also found the two officers liable for malicious prosecution.

When the trial court instructed the jury on the "damage" portion of the verdict, they were instructed that they could award "substantial damages" for both conspiracies without proof of actual injury. If the jury found malicious or wanton conduct in regard to the conspiracies, the jury was instructed that they could award punitive damages in addition to the award of "substantial damages." If the jury found that Lenard had sustained actual or compensatory damages from the malicious prosecution, the jury was instructed to award such damages to Lenard. If Lenard had not sustained any actual damages, they were instructed to award a nominal sum. They were also instructed that punitive damages could be awarded if they found by a preponderance of the evidence "that the acts and conduct of the defendants toward the plaintiff were maliciously done." (R. 2382).

 The trial court went on to further explain the three types of damages upon which they had been instructed. Actual damages represented any direct out-of-pocket expenses Lenard sustained because of the defendants' acts and conduct. The trial court viewed "substantial damages" as a category presumed to flow from every conspiracy to obstruct justice or deprivation of equal protection.[7] It was seen as a category separate from actual damages or punitive. This Court finds that it was error to

---

7. "Substantial damages, as I have described in these instructions, are those which are presumed to flow from every conspiracy to obstruct justice, and every conspiracy to deprive plaintiff of equal protection of the laws or of equal privilege or immunity under the laws. It is for you to determine the amount of the substantial damages, as it is for you to determine the amount of the actual damages." (Tr. 2385).

instruct the jury as to a separate and distinct category of damages classified as "substantial damages."

In *Carey v. Piphus,* 545 F.2d 30 (7th Cir. 1976), *rev'd* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1977), the Supreme Court reversed the position of this court regarding the awarding of damages to students who were suspended from public elementary and secondary schools without procedural due process. We had held that the students were entitled to recover substantial non-punitive damages in the absence of proof of actual injury caused by the denial of procedural due process. The Supreme Court held "that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights." 435 U.S. at 266, 98 S.Ct. at 1053. *Carey* was limited to procedural due process violations rather than the substantive constitutional violations of this case.

 When the Court overruled the holding in *Carey,* it refrained from overruling the line of cases upon which this court had based *Carey.* The Supreme Court held:

> ... the elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another. As we have said, *supra,* at 258–259 [98 S.Ct. at 1049–1050], these issues must be considered with reference to the nature of the interests protected by the particular constitutional right in question.

435 U.S. at 264–65, 98 S.Ct. at 1052–1053. As recently pointed out in this court by Justice Stewart, retired, sitting by designation in *Owen v. Lash,* 682 F.2d 648 (7th Cir.1982), several courts have considered the question of awarding compensatory damages for substantive constitutional violations in the absence of consequential injury. Several of the courts, under the circumstances of their particular case and the nature of the constitutional violations, found damages could "be presumed where there is

an infringement of a substantive constitutional right." *Williams v. Trans World Airlines, Inc.,* 660 F.2d 1267, 1272 (8th Cir. 1981). *See also Owen v. Lash,* 682 F.2d at 657–59. Examining the circumstances of this case and the substantive constitutional issues, it was proper for the jury to consider and award damages for these violations in the absence of discernible consequential injuries.

There is no question that Lenard is entitled to a damage award for a violation of 42 U.S.C. § 1985(3). Such a right to damages is provided for within § 1985(3). This court, however, does not find that there is a separate category of damages known as "substantial damages" which flow from civil rights violations. While it is recognized that courts must exercise creativity in fashioning remedies for violations of constitutional rights, we are mindful of the Supreme Court's instruction in *Carey* that:

> ... the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question—just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law.

435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1977). While the Court in *Carey* made several references to "substantial damages" or "substantial non-punitive damages," [8] it is our reading that the word "substantial" was used as an adjective modifying the noun "damages" and not as a descriptive phrase alluding to a category of damages. Classification of damages as actual or compensatory, nominal and punitive are terms of art which have a substantive meaning in legal jurisprudence. "Substantial" is an adjective modifying damages and conveys no legal meaning. Rather, it gives a quantitative character to the damages.

We cannot but feel that the repeated use of the phrase "substantial damages" by the district court (11 times, plus inclusion as a category in the verdict form) in its instruc-

---

8. *See* 435 U.S. at 252, 253, 254, 261, 266, 98 S.Ct. at 1046, 1047, 1051, 1053.

tions to the jury and the instruction that such damages could be awarded without proof of actual injury greatly influenced this large verdict. "Repetitious instructions which place undue emphasis on matters favorable to either side constitute reversible error." *Flentie v. American Community Stores, Corp.*, 389 F.2d 80, 83 (8th Cir.1968). In light of the erroneous use of the term "substantial" in the verdict form and the instructions in keeping with that form, we reverse and remand this case for retrial on the issue of damages.

#### b. Punitive

 Additionally, the award of $150,000 and $75,000 in punitive damages against Argento and Sansone, respectively, without a showing as to which claim, the conspiracies or the malicious prosecution, the award as assigned or apportioned requires remand in this instance. Federal law governs the right to punitive damages in civil rights violations. *Basista v. Weir*, 340 F.2d 74 (3d Cir.1965). To warrant an award of punitive damages, it must be demonstrated that "there was a degree of willful and wanton disregard of plaintiffs' right not to suffer this sort of discrimination." *Seaton v. Sky Realty Co., Inc.*, 491 F.2d 634, 638 (7th Cir.1974). Because of our holding on the issue of malicious prosecution, *supra,* and the single sum award of punitive damages, we cannot apportion the award among the counts of the complaint. Punitive damages may be awarded to punish a defendant for his outrageous conduct but also to deter the defendant and others from engaging in the same or similar conduct. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974); *see also, City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); W. Prosser, Law of Torts, § 2 at p. 9 (4th ed. 1971). Damages should not go beyond deterrence and become a windfall.

#### c. Damage evidence that can be presented

Several issues were raised on appeal regarding damages and evidence regarding damages which we will consider in order to guide the district court in the retrial.

The district court below held that no evidence in the damage portion of the trial could be introduced regarding the "beating" as the jury found no "actual" beating had occurred. The district court instructed Lenard's counsel that:

THE COURT: That is not what the Court is saying. I am saying any evidence that flows from the damages resulting from Mr. Lenard being maliciously prosecuted or conspired against may come in; but on the 1983 charge, of having been beaten or the use of excessive force and deprivation of his constitutional rights, that I am precluding.

The Court feels it has no choice, in light of the jury's verdict. If you feel I read the jury's verdict incorrectly, then, of course, you make the exception you have and call for a mistrial. But I feel there is no other choice.

\* \* \* \* \* \*

THE COURT: So the record is clear, Mr. Bertucci, there can be no reference to a cover-up of a beating which I state for the record the Court has concluded that the verdict has been returned that that proof has not been established by a preponderance of the evidence.

MR. BERTUCCI: What I want to know, your Honor—

THE COURT: You are limited in that, that is correct.

MR. BERTUCCI: But what can I say the conspiracy was?

THE COURT: Whatever conduct, other than the beating, which was alleged to have occurred in this case you feel occurred, any conduct other than that, whether it relates to the malicious prosecution or any other action which violated the constitutional rights of the plaintiff may be addressed in your argument, and you may ask for substantial damages and punitive damages, with regard to that.

But there cannot be any reference to the beating. So that the record is clear, I am precluding that, so if you have any comment on that, I certainly would hear you.

(Tr. 2280, 2345–46). Counsel made offers of proof of the physical injuries sustained, the subsequent surgeries, the consequential monetary losses, and the pain and suffering caused by the incident. No damage evidence went to the jury except the arguments of counsel.[9]

▮ While the district court was correct in holding that no evidence of damage from an alleged "beating" could be presented to the jury because of its prior decision, the district court erroneously prevented the presentation of any of the proffered evidence of injuries, medical treatment and losses caused by those injuries sustained while in police custody as they relate to the conspiracy counts. In other words, any evidence of injuries proved incurred from the time shortly after the accident to Lenard's release to his family late that evening should be admitted as they relate to being sustained while in police custody. These injuries cannot be presented or argued, however, as being the result of a beating but presented as injuries incurred somehow while under police supervision and protection.

It has been recognized that prisoners are entitled to protection from excessive use of force by police officers. *Clark v. Ziedonis,* 513 F.2d 79 (7th Cir.1975). This court has held that where there is a showing of deliberate deprivation of constitutional rights while confined, a prisoner is entitled to damages. *Black v. Brown,* 513 F.2d 652 (7th Cir.1975); *Little v. Walker,* 552 F.2d 193, 197–98 (7th Cir.1977). On reconsideration of the damages on remand, evidence relating to the eye injury and the shoulder injury, the corrective surgeries performed, the costs and monetary losses from these injuries and the prognosis for recovery should be presented to the jury.

▮ Damages may also be considered and awarded for constitutional deprivations. As we held in *Hostrop v. Board of Junior College District No. 515,* 523 F.2d 569 (7th Cir.1975), *cert. denied,* 425 U.S. 963,

96 S.Ct. 1748, 48 L.Ed.2d 208 (1976), the trial court should consider, when making an award for constitutional violations, "the nature of the constitutional deprivation and the magnitude of the mental distress and humiliation suffered by the plaintiff, as well as any other injury caused as a result of being deprived of federally protected rights ..." *Id.* at 580. As recently pointed out in this court by Justice Stewart in *Owen v. Lash, supra,* several courts "have awarded significant damages to compensate for the deprivation of a constitutional right despite the absence of proof on consequential injury." 682 F.2d at 658.

As this court pointed out in *Hostrop:* Although the amount of damages for such an injury cannot be determined by reference to an objective standard, recovery of non-punitive damages for deprivation of intangible rights for which no pecuniary loss can be shown is not without precedent. Courts have traditionally assessed such damages for tortious injury. Examples in civil rights litigation include the awarding of damages for the deprivation of voting rights, for the abridgment of equal opportunities to housing, for illegal assets, and for violation of the right against unlawful searches and seizures. 523 F.2d at 579 (cites omitted). *See also Seaton v. Sky Realty Co., Inc.,* 491 F.2d 634 (7th Cir.1974); *Corriz v. Naranjo,* 667 F.2d 892 (10th Cir.1982), appeal dismissed per S.Ct. Rule 53, —— U.S. ——, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982).

▮ Upon retrial for damages, Lenard should be allowed to argue damages flowing from the nature of the constitutional deprivation, the mental distress, humiliation or any other injury, if any, caused as the result of the violation of his constitutional rights.

### d. Duplicative Award

Argento and Sansone argue on appeal that any damage award for a civil conspir-

---

**9.** This was a bifurcated trial lasting over 5½ weeks with the same jury determining liability as well as damages.

acy would be a duplicative damage award for the act which implemented the conspiracy. They argue that the damages for the conspiracy counts cannot represent the "beating" but must relate to the conspiracy to prosecute Lenard. The damages for the act of prosecution, they contend, were compensated under the instructions related to the malicious prosecution count and cannot be compensated again under the conspiracy count.

■ However, the instructions for the conspiracy damages were not isolated to a particular event but rather related to the deprivation of rights of "due course of justice" and "equal protection under the law." [10] An award under § 1985 would not be duplicative of the prosecution or the beating but, in this case, go to the finding of deprivation of civil rights while in police custody. See *Corriz v. Naranjo*, 667 F.2d at 896–898. While courts have held that an award of damages for a state tort claim joined with a federal civil rights action would be duplicative when there is an adequate state tort remedy, *Clappier v. Flynn*, 605 F.2d 519, 529 (10th Cir.1979), there are in this case, only strictly federal civil rights claims. As previously indicated, § 1985 provides damages for "injury or deprivation." Thus, it is possible under § 1985 to award damages for the act which effectuated the conspiracies and for the conspiracy which caused the deprivation. See *Stringer v. Dilger*, 313 F.2d 536 (10th Cir.1963).

In summary, upon remand for retrial on damages, we direct that there is no category of damages called "substantial," that the evidence of bodily injury sustained by Lenard during his police custody and the related treatments, costs and prognosis shall be considered as damages under § 1985 (but they should not be couched as beating injuries), and that any evidence of injuries, i.e., mental distress or humiliation, sustained by Lenard as a result of the deprivation of his federal protected rights should be presented to the jury. However, the awards should

not be duplicative of any other compensated injuries. Because of our finding of probable cause and reversal of the malicious prosecution count, no damages under Count III shall be considered on remand.

### III. Miscellaneous

#### a. Omission of "beating" on the verdict form

Lenard argues that the omission of "battery," "beating," or "excessive force" in the verdict forms submitted to the jury was confusing and misleading. He contends that the general phrase regarding deprivation of "his rights, privileges or immunities" failed to inform the jury that these phrases referred to the excessive use of force. He further contends that the jury could have been confused because the verdict form was captioned with the Village of Melrose Park as well as the other named police defendants when in fact the Village was not charged under Count I of the complaint.

■ In reviewing the verdict forms, we must look at the instructions to the jury which complement the forms. Instructions should not be isolated in review but the court should look at the total scheme. *Dreckman v. Flores*, 331 F.2d 221 (7th Cir. 1964). See also *Alloy International Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222 (7th Cir.1980). In this instance, the trial court adopted the phraseology of § 1983 and then proceeded to break down the elements which Lenard had to prove by a preponderance of the evidence. In doing so, the charge read:

In order to prove his claim that defendants Argento, Sansone, Zito and Culotta, or some of them, deprived him of any of his rights, privileges or immunities secured by the Constution [sic] and laws, the burden is upon the plaintiff to establish by a preponderance of the evidence each of the following propositions:

"One, that these defendants, or some of them, knowingly beat, bruised and wounded plaintiff about the face, head and body as alleged.

---

10. "Where a plaintiff has proven a conspiracy to obstruct justice and a conspiracy to deprive him of equal protection of the laws, or of equal

privileges and immunities under the law, he is entitled to recover without proving any actual injury, substantial damages." (Tr. 2381).

"Two, that these defendants or some of them then and there acted under color of some law of the State of Illinois or some ordinance of the Village of Melrose Park.

"Three, that the acts and conduct of these defendants, or some of them, deprived the plaintiff of some of his federal constitutional rights, and

"Four, that the acts and conduct of these defendants or some of them were the proximate cause of injuries and consequent damage to the plaintiff." (Tr. 2198–99). Thus, looking at the instruction and the accompanying verdict form, it is clear that the deprivation of "privilege and immunities" went to the alleged beating "of the face, head and body" of Lenard. The exact wording of an instruction is within the discretion of the court and will not be overturned unless there was an abuse of that discretion. *See Emery v. Northern Pacific Railroad Company,* 407 F.2d 109 (8th Cir.1969). It is clear from the instruction that the verdict form related to the "beating."

 While the verdict form was captioned with the Village's name, the instruction clearly indicated the named police defendants. "[O]nly when there is a complete absence of positive fact to support conclusions reached (by the jury) does a reversible error appear." *Almendarez v. Atchison, Topeka and Santa Fe Railway Co.,* 426 F.2d 1095, 1099 (5th Cir.1970), citing *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946). We find no prejudicial error in the form caption or the omission of "beating" in the verdict form itself.

### b. Jury Instructions

The defendants Argento and Sansone argue that the jury instruction regarding the conspiracy to obstruct justice was overly broad and led the jury to believe that if the defendants were guilty of malicious prosecution they would be similarly guilty on the conspiracy charge. A similar argument was made regarding the equal protection instruction. We cannot agree.

 An examination of the record clearly indicates that the trial court properly instructed the jury on the elements of the conspiracy to obstruct justice and the elements of the conspiracy to deprive equal protection. These elements were broken down numerically and relevant terms were defined for the jury. The instruction regarding the malicious prosecution clearly went to the initiation and prosecution of the state charges and not to any civil rights deprivations.[11] As the trial court had done in the other Counts, it enumerated the elements of the cause of action which clearly delineated to the jury that the malicious prosecution went to the criminal charges and not to any police misconduct. Inasmuch as the jury was properly instructed as to the issues before them, given an understanding of those issues and charged with the duty to determine those issues, we find no prejudicial error to Argento and Sansone. As this court repeated in *Alloy International Co. v. Hoover-NSK Bearing Co.:*

The test then, is not what meaning the ingenuity of counsel can at leisure attribute to the instructions, but how and in what sense, under the evidence before them and the circumstances of the trial,

---

11. "In order to prove his claim that defendants Argento and Sansone, or one of them, maliciously prosecuted him for the offenses of no valid driver's license, resisting arrest, unlawful use of weapons, no firearm owner's identification card, improper lane usage, driving under the influence of alcohol and failure to reduce speed to avoid an accident, or some of them, the burden is upon the plaintiff to establish by a preponderance of the evidence each of the following propositions:

One, that a criminal proceeding was commenced against the plaintiff.

Two, that defendants Argento and Sansone, or one of them, commenced the criminal proceeding against the plaintiff.

Three, that the plaintiff was found not guilty of one or more of the charges.

Four, that a criminal proceeding was commenced by defendants Argento and Sansone, or one of them, without probable cause.

Five, that defendants Argento and Sansone, or one of them, acted with malice and,

Six, that the defendant was damaged by the criminal proceeding." (Tr. 2209).

ordinary men acting as jurors will understand the instructions.

635 F.2d at 1228 (citations omitted).

Argento and Sansone contend that the instructions are overly broad because any misconduct by the defendants would create liability for conspiracy. As previously indicated, any act in the furtherance of or implementation of the conspiracy agreement creates the liability. Thus, if the jury found an agreement between Argento and Sansone and an act in the furtherance of that agreement to hinder the due course of justice or to deny equal protection under the law, the civil conspiracy is triggered.[12] It is within the dominion of the jury to decide upon the evidence what act of the defendants supported the conspiracy not the instructing court. This jury was not set loose in a vague and cloudy field of legal concepts as charged. It must be pointed out, however, that since this court has found probable cause to arrest Lenard, the prosecution of those charges was not malicious, and the conspiracy count must fail.

In light of our finding of probable cause to effect the arrest of Lenard and reversal of the jury's finding on the malicious prosecution, the challenged instructions regarding the malicious prosecution need not be discussed. Finally, Argento and Sansone challenge the instruction of the trial court as to the Thirteenth Amendment and prejudicial introduction of "slavery" and "involuntary servitude" in this case. The defendants have, however, overlooked the fact that 42 U.S.C. § 1981 et seq. has its constitutional derivation from the Thirteenth and Fourteenth Amendments. As the Supreme Court held in Griffin:

By the Thirteenth Amendment, we committed ourselves as a Nation to the proposition that the former slaves and their descendants should be forever free. To keep that promise, "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." Jones v. Alfred H. Mayer Co., supra, [392 U.S.] at 440 [88 S.Ct. at 2203]. We can only conclude that Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men.

403 U.S. at 105, 91 S.Ct. at 1799.

Examining all the instructions as a whole, we do not find the objected to instructions overly broad, confusing or prejudicial.

c. Motions in Limine

The trial court granted a Motion in Limine barring the introduction of evidence of a prior arrest and conviction of Lenard on voluntary manslaughter on March 23, 1953 in Arkansas. He was sixteen years old at the time, but there is no indication on the judgment of conviction (Exhibit A at R. 285) whether or not he was adjudicated as a juvenile. Argento and Sansone contend the granting of the Motion was prejudicial error as this conviction went to the issue of Lenard's violent tendencies and antipathy to the law. It is contended that Lenard presented himself as a lifetime law abiding citizen and the defense was prevented from impeaching his credibility through the introduction of three prior arrests and one conviction.[13] While Argento and Sansone

12. "So where the evidence in the case shows such a common plan or arrangement between two or more persons, evidence as to an act done or statement made by one such person is admissible against all, provided that the act be knowingly done or the statement be knowingly made during the continuance of the common plan or arrangement, and in furtherance of some intended object or purpose of the common plan." (Tr. 2204).

13. Lenard was arrested for premeditated murder but pled guilty to voluntary manslaughter on March 23, 1953. He was apparently arrested in 1960 and resisted arrest in July, 1968. (Offer of proof Tr. 1648–49). Those arrests were not prosecuted. It is unclear from the record, as several documents are missing, but there is passing reference to a gambling conviction but it is not further identified. The trial court granted Lenard's Motion in Limine prohibiting reference to the prior gambling convic-

argue that this evidence went to the issues in the malicious prosecution count, it could have related to the other counts as well.

Federal Rules of Evidence 609 [14] permits the admission of evidence of the prior criminal conviction of a witness to attack his credibility if the probative value of the evidence outweighs its prejudicial effect. However, convictions more than ten years old are inadmissible "unless the court determines, in the interest of justice" that the probative value outweighs the prejudicial effect. *Id.* In addition, juvenile adjudications are similarly inadmissible. In this instance, the conviction was twenty-four years old occurring when Lenard was a juvenile.

This court has always carefully considered the prejudicial impact of prior convictions and has recommended a standard for the trial courts to guide them in their discretionary function. *See, United States v. Mahone,* 537 F.2d 922 (7th Cir.), *cert. denied,* 429 U.S. 1025, 50 L.Ed.2d 627 (1976). The determination whether the evidence of a prior conviction is more proba-

tive than prejudicial is within the trial court's discretion. The House Committee on the Judiciary, when considering the proposed Federal Rules of Evidence, recommended that convictions older than ten years should be totally inadmissible.[15] The Senate's recommendation was that of admission of the conviction on only very rare and exceptional circumstances.[16] The present rule is a version of the Senate recommendation. The Sixth Circuit in *United States v. Sims,* 588 F.2d 1145, 1150 (6th Cir.1978) held that "609(b) creates, in effect, a rebuttable presumption that convictions over ten years old are more prejudicial than helpful and should be excluded." Lenard's conviction was sufficiently remote in time, under possible juvenile adjudication circumstances, and unrelated to his truth telling capabilities or the events in this action. It was not error for the trial court to determine that admission would be highly prejudicial and not in the interest of justice.

Lenard contends the trial court erred when it granted the Motion in Limine of Sansone and Zito regarding their guilty pleas to bribery charges and thirty day sus-

---

tion and the prior manslaughter conviction for impeachment purposes. (Tr. Vol. A p. 7). The trial court did not, however, outline on the record the factors considered consistent with this court's standard in *United States v. Mahone,* 537 F.2d 922, 929 (7th Cir.), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976).

14. Federal Rules of Evidence 609 provides:
 (a) General rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.
 (b) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the

conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

\* \* \* \* \* \*

 (d) Juvenile adjudications. Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.
Federal Rules of Evidence 609.

15. H.R.Rep.No. 650, 93rd Cong. 1st Sess., reprinted in, 1974 U.S.Code Cong. & Ad.News pp. 7051, 7085.

16. S.Rep.No. 1277, 93rd Cong. 2d Sess., reprinted in, 1974 U.S.Code Cong. & Ad.News pp. 7051, 7062.

pensions which occurred in August, 1978.[17] It is argued the Village's treatment of these officers on the bribery charge supported the allegations of the Village condoning police misconduct and that such evidence is admissible under Federal Rules of Evidence 404(b).[18]

Generally evidence of other criminal activities is inadmissible unless the evidence of the other crimes or misconduct is relevant. It would be relevant if it bore upon the intent, knowledge, or absence of mistake or accident of the defendant. *United States v. Peskin,* 527 F.2d 71, 84 (7th Cir.1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). *See also, United States v. Jones,* 438 F.2d 461, 465 (7th Cir. 1971); *United States v. Marine,* 413 F.2d 214, 216–17 (7th Cir.1969), *cert. denied,* 396 U.S. 1001, 90 S.Ct. 550, 24 L.Ed.2d 493 (1970). The admissibility of other criminal conduct is within the discretion of the trial court. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Fierson,* 419 F.2d 1020 (7th Cir. 1969); *United States v. Grabiec,* 563 F.2d 313 (7th Cir.1977).

The bribery admissions of Sansone and Zito do not relate to any charge against them in this civil action. The bribery and suspensions do not demonstrate any intent or knowledge which correlates to any civil rights deprivation or physical abuse. While both charges might demonstrate police misconduct, the admission of the subsequent suspensions would have to be weighed by the trial court for its prejudicial versus probative value. In addition, Lenard is not seeking to use the evidence against Sansone and Zito but against the Village to prove its intent to condone misconduct. Thus, Lenard is not seeking to use the evidence to show the intent of Sansone and Zito to commit police misconduct but rather to impose a completely different intent upon the Village. The proposed use of this evidence is completely outside the exceptions of 404(b). The suspensions are unrelated to any facts at issue in this case and do not have "any tendency to make the evidence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Federal Rules of Evidence 401. The trial court properly acted within its discretion to deny the admission of the suspensions.

Lenard also argues the trial court erred when it granted the Motion in Limine in respect to the police officer defendants' assertion of their Fifth Amendment privileges to internal investigators and the Cook County Grand Jury investigating the incident. (The officers did testify two weeks later). Lenard argues that the Village's failure to discipline the officers for invocation of their Fifth Amendment privilege was further evidence of a Village cover-up or condoning of misconduct. The Supreme Court held in *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), however, that a police officer cannot be disciplined for invocation of his Fifth Amendment privilege nor his failure to sign a waiver of immunity with respect to any testimony when the officer is called before a grand jury investigating criminal conduct with which he may be involved. Thus, the Village was prohibited from disciplining the officers under *Gardner.* Failure to discipline could not then be part of a cover-up. The failure of the Village to reinterview the defendants for its own internal investigation after their waiver of privilege before the Grand Jury fails to demonstrate an intention to cover-up, especially when Sansone and Zito were suspended a year and a half later. The trial court acted within its discretion in granting the Motion.

---

17. On August 30, 1978, Sansone and Zito entered guilty pleas to soliciting and accepting a $100.00 bribe on June 24, 1978.

18. Federal Rules of Evidence 404(b) provides:
 (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

#### d. Statements made by counsel

While this Court appreciates the advocacy displayed by these attorneys on behalf of their clients, there were times during the course of reviewing the briefs and records of this case when it wondered whether these attorneys were in the same courtroom hearing the same case. While florid language and zealous advocacy display commitment to their respective causes, exaggerations and personal attacks do not factually present issues before an appellate court.

Defendants Argento and Sansone contend on appeal that several statements made by Lenard's counsel, including statements regarding religious affiliations and the veracity of Sansone in his testimony, amounted to reversible error. Personal observations, evaluations and recommendations are not part of the role of trial counsel but in the context of all the evidence and the clear cautionary instructions of the trial court regarding the arguments of counsel, these statements do not rise to the level of reversible error. We find any error in statements made by either counsel to be harmless error within Fed.R.Civ.P. 61. *Kotteakos v. United States,* 328 U.S. 750, 761–62, 66 S.Ct. 1239, 1246–1247, 90 L.Ed. 1557 (1946). We do congratulate the trial court for its very fair, even-handed handling of this long difficult case.

### IV. Attorney Fees

The conclusion of the trial was far from the conclusion of the issues of the Lenard case on appeal. In October, 1980, the trial court in a Memorandum Opinion (R. 281) ruled that each party had prevailed to some extent and denied cross-motions by the plaintiff and defendants for attorney fees under the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. § 1988.[19] Subsequent to that decision, this appellate court modified its prior ruling of *Roesel v. Joliet Wrought Washer Co.,* 596 F.2d 183 (7th Cir.1979), in the cases of *Coop v. City of South Bend,* 635 F.2d 652 (7th Cir.1980) and *Murphy v. Kolovitz,* 635 F.2d 662 (7th Cir.1981). As a result of this modification, the trial court reconsidered the question of attorney's fees and granted the plaintiff's motion regarding fees.[20] The trial court denied Defendants' Motion to Reconsider on May 29, 1981. On the same date the trial court awarded to the plaintiff attorney's fees in the amount of $180,500. The trial court also awarded costs to the plaintiff. Argento and Sansone made a Motion to Reconsider the Award of $180,500 in fees pointing out that the attorneys had entered into fee agreements with Lenard limiting their fees to ⅓ of the recovery at trial. The trial court in its Memorandum Opinion examined the case law of other circuits and the terms of the 1981 fee agreement[21] and found that plaintiff's counsel had limited their fees to one-third of the judgment. The court then modified the fee award to $120,000. This Memorandum Opinion was entered on June 19, 1981.

On June 26, 1981, the defendants filed notice of appeal from all orders of the dis-

---

**19.** 42 U.S.C. § 1988 provides:

... In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

**20.** Memorandum Opinion dated January 30, 1981.

**21.** The January 21, 1981 Attorney's contract signed by Bennie Lenard and Cecile Singer provided in part:

I HEREBY accept the foregoing terms and conditions and agree to make no charge for our services unless and except to the extent that money or property is recovered on such claims or suits. I further agree to make no settlement without the consent of the above claimant. I further agree that any money awarded as and for attorneys fees under the Civil Rights Attorneys Fees Award [sic] Act, for services rendered in prosecution of the trial, appeal before the Seventh Circuit Court of Appeals, and the retrial (if necessary) of this cause shall be applied and credited, up to and including, but not to exceed the stated per centage [sic] of the amount recovered on the claim (33⅓% for trial; 40% for trial and appeal; 50% for trial, appeal, and retrial).

trict court related to fees and costs. On June 29, 1981, the plaintiff filed in the district court a Motion to Reconsider the reduction of fees. This motion was within the ten-day time requirements of post-judgment motions. The court ordered memorandums of the issue of fee reduction and held oral arguments on the issue. After consideration of the memorandums and arguments, the district court found the disputed provision of the 1981 fee agreement ambiguous. Since the court found the contract terms ambiguous, Illinois case law permitted the use of extrinsic evidence to enable the court to reach a proper interpretation. Considering the affidavits of Lenard and Attorney Singer, the court held the provision was a credit provision and not a limit to attorney's fees. The district court ordered the vacation of the June 19 judgment and the reinstatement of the award of $180,500 in attorney's fees in a Memorandum Opinion of July 29, 1981.

On appeal, initially, Argento and Sansone argue that the district court did not have jurisdiction over Lenard's June 29 Motion to Reconsider because they had already filed their appeal. In addition, it is argued that Lenard was not the prevailing party; that special circumstances require denial of fees; that the fees should be limited to the contingent contract; that the trial court did not limit the fees to the successful claims; that fees should not be awarded for the pendent claim of malicious prosecution; and that costs should not have been awarded under § 1988.

■ As a result of this Court's decision reversing the judgments under Counts III and V of the Complaint, affirming the jury verdict on Count I and remanding the case for retrial of damages under Count II, the issue regarding the final amount of attorney's fees must also be remanded to the trial court. In light of Judge Posner's concerns over the "nest of Chinese boxes" in civil rights litigation (*Muscare v. Quinn*, 680 F.2d 42 (7th Cir.1982)), we will address some of the issues raised on appeal.

■ The filing of a timely Motion for appeal has the effect of transferring the jurisdiction over the case from the district court to that of the appellate court. 9 Moore's Federal Practice ¶ 203.11 (1982); *United States v. Lafko*, 520 F.2d 622 (3d Cir.1975). Under Fed.R.App.P. 4(a)(1) the notice of appeal should be filed within 30 days from the entry of judgment or order appealed from. However, the rule further provides that:

(4) If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party: (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59 to alter or amend the judgment; or (iv) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. A notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above. No additional fees shall be required for such filing.

Fed.R.App.P. 4(a)(4).

■ For the purposes of Rule 4(a), a motion to reconsider has been held to qualify as a Rule 59(e) motion. *Richerson v. Jones*, 572 F.2d 89, 93 (3d Cir.1978); *Jones v. Nelson*, 484 F.2d 1165, 1167–68 (10th Cir. 1973); 9 Moore's Federal Practice ¶ 204.-12[1], p. 4–67 (1982). Thus, a timely motion to reconsider postpones the running of the time for appeal. If the time to file is postponed by a motion, the district court must have jurisdiction to consider the motion. As the rule states "[a] notice of appeal filed before the granting or denying of any of the above motions shall have no effect. A new notice must be filed ..." Fed.R.App.P. 4(a)(4). We find that the district court had jurisdiction to consider the Motion to Reconsider the opinion of June 19, 1981, timely filed by the plaintiff on June 29, 1981. The defendants filed a no-

tice of appeal from the opinion reinstating the fees of $180,500 on August 31, 1981. Per stipulation, all appeals were consolidated for hearing and oral argument. We will now consider the appropriateness of attorney's fees and the factors that should be considered by the trial court in the awarding of fees.

The awarding of attorney's fees is within the discretion of the trial court but that discretion is a narrow one. *Dawson v. Pastrick,* 600 F.2d 70, 79 (7th Cir.1979). The fees should only be denied when special circumstances would render an award unjust. *Id.* The key to the award of attorney's fees is the determination as to who is the prevailing party. This Circuit in *Busche v. Burkee,* 649 F.2d 509, 521 (7th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), adopted the definition of the First Circuit in *Nadeau v. Helgemoe,* 581 F.2d 275, 278–9 (1st Cir. 1978) which stated: ·

plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed *on any* significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.

(emphasis added).

On the trial court level, Lenard failed in the significant allegation of the "beating" under § 1983. Similarly, while he was sustained in his charges under the conspiracy counts, the jury found liability only for Argento and Sansone and not the other named defendants. On this appeal, this Court has only affirmed the findings of the jury on one of the conspiracy charges and reversed the findings on the malicious prosecution and obstruction of justice. This Circuit has held that "a prevailing plaintiff should receive fees almost as a matter of course." *Davis v. Murphy,* 587 F.2d 362, 364 (7th Cir.1978). It cannot be said, however, that Lenard has prevailed in the case as a whole but rather he was partially successful in his civil rights claims. As was held in *Muscare v. Quinn,* 614 F.2d 577, 580 (7th Cir.1980), attorney's fees should be awarded only for the preparation and presentation of claims on which the plaintiff

has prevailed. "[T]he amount of attorney's fees they receive [prevailing plaintiff] should be based on the work performed on the issues in which they were successful." *Nadeau v. Helgemoe,* 581 F.2d at 279; *Busche v. Burkee,* 649 F.2d at 522. *See also Coop v. City of South Bend, supra; Murphy v. Kolovitz, supra; Harrington v. DeVito,* 656 F.2d 264 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982). On remand the trial court should carefully review the time sheets on the successful claim of Count II in light of the *Waters v. Wisconsin Steel Works,* 502 F.2d 1309 (7th Cir.1974) factors adopted in *Muscare v. Quinn,* 614 F.2d at 579. *See also Busche v. Burkee,* 649 F.2d at 522.

The defendants argue that, even if Lenard did prevail, fees should be denied because of the special circumstances of the size of the damage award, the contingent attorney contract and the financial position of the defendants. The amount of the damage award, large or small, is not a circumstance to be considered in the awarding of fees. *Coop v. City of South Bend,* 635 F.2d at 654. The purpose of the Attorneys Fees Awards Act was to effectuate and assist the private citizen in the enforcement of the Civil Rights Act. (See the legislative history, S.Rep. No. 1011, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad.News 5908–5914). We do not view the size of any damage award as a special circumstance to be considered in the award of these attorney's fees. *But see Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760 (7th Cir.), *petition for cert. filed,* 51 U.S. L.W. 3055 (U.S. May 19, 1982) (No. 81–2135); *Mirabal v. General Motors Acceptance Corp.,* 576 F.2d 729 (7th Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978). The trial court may consider as a factor the contingent fee contract, but it is not to be an automatic limitation on the attorney fee award. *See Sanchez v. Schwartz,* 688 F.2d 503 (7th Cir. 1982); *Strama v. Peterson,* 689 F.2d 661 (7th Cir.1982). *See also Sargeant v. Sharp,* 579 F.2d 645 (1st Cir.1978). Additionally, while we recognize that these defendants

900

are two young police officers, the ability to pay a fee award has been held not to be a special circumstance that would bar an award. *Entertainment Concepts, Inc. v. Maciejewski,* 631 F.2d 497 (7th Cir.), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1980). We are aware that currently the question of the insurance company's liability for the damage award is being litigated in the magistrate's court. We do not express any opinion regarding amount of damages, fees or costs to affect those proceedings.

▆▆▆ As Chief Judge Cummings recently wrote in *Sanchez v. Schwartz, supra,* a contingent fee contract should not serve "as an automatic ceiling on the amount of a statutory award." 688 F.2d at 505. *See also Furtado v. Bishop,* 635 F.2d 915, 920 (1st Cir.1980).[22] The trial court properly reconsidered the disputed provision of the 1981 fee agreement.[23] It is the function of the courts to seek the proper interpretation of a contract which reflects the intentions of the parties. *Stanley v. Chastek,* 34 Ill.App.2d 220, 180 N.E.2d 512, 520 (2d Dist.1962); *Greene v. Gust,* 26 Ill. App.2d 2, 167 N.E.2d 438, 441 (1st Dist. 1970); 4 S. Williston, A Treatise on the Law of Contracts § 601 (3d ed. 1961). It is clear from the contract, the memorandum in support of the Motion to Reconsider and the affidavits attached thereto that it was the intention of Lenard and his attorneys that any award under § 1988 would be credited to any fees owing under the contingent contract. The excess attorney's fee award, if any, would go to the attorneys. We cannot express or confirm the final amount of the attorney's fees because the trial court must reexamine the award and limit the fees to the prevailing issue.

▆▆▆ The defendants contend that the trial court improperly awarded costs

under § 1988. They base this contention upon the fact that the court reversed its stand regarding costs after it reconsidered the attorney's fees issue in January, 1981. Costs are allowable under § 1988. *Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624, 642 (6th Cir. 1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980); *Konczak v. Tyrrell,* 603 F.2d 13, 18–19 (7th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). Costs are also allowable under Fed.R.Civ.P. 54(d) and 28 U.S.C. § 1920. These costs are awarded to the prevailing party. *Busche v. Burkee,* 649 F.2d at 522. It must be remembered that up to January, 1981, the trial court regarded this case a draw. It was only after the clarification of "prevailing" in civil rights cases that the trial court awarded costs. While the court did not indicate, in its Order awarding costs, the statutory basis for the award, we believe that such costs are allowable under § 1988, 54(d) and § 1920. Deposition costs are allowable within the discretion of the trial court, *Bailey v. Meister Brau, Inc.,* 535 F.2d 982, 996 (7th Cir. 1976), as are copying costs, *SCA Services, Inc. v. Lucky Stores,* 599 F.2d 178, 180 (7th Cir.1979). We find no abuse of discretion in the trial court regarding the costs.

Since Lenard was successful in prevailing on the issue of conspiracy to deprive equal protection, on appeal, the trial court should determine the reasonable fees on this issue on appeal keeping in mind the totality of the case. *See Muscare v. Quinn,* 680 F.2d 42, *supra. See also Hanrahan v. Hampton,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980).

V. Conclusion

For all the above reasons we:

1. Affirm the jury verdict as to Count I;

22. *But see Cooper v. Singer,* 689 F.2d 929 (10th Cir.1982). The 10th Circuit *Cooper* decision holds the amount of fees under a contingent contract to be the maximum allowable amount to be awarded under § 1988. This is contrary to this Circuit's holding in *Sanchez v. Schwartz, supra,* wherein we declined to hold a

contingent fee contract as an automatic ceiling on an award and concluded that any such holding would be contrary to the legislative history. 688 F.2d at 505. See Judge Holloway's dissent in *Cooper.*

23. See fn. 21, *infra.*

2. Affirm the jury verdict as to liability under Count II but reverse and remand for retrial as to damages under Count II as to defendants Argento and Sansone;

3. Reverse the jury verdict as to Count III as to defendants Argento and Sansone;

4. Reverse the jury verdict as to Count V as to defendants Argento and Sansone;

5. Affirm the jury verdicts as to Zito and Culotta;

6. Affirm the Directed Verdict as to the Village of Melrose Park;

7. Reverse the District Court's award of $180,500 in attorney's fees and remand for recalculation in light of this opinion;

8. Remand to the District Court for determination of attorney's fees on appeal for those issues on which Lenard prevailed in this court.

Circuit Rule 18 shall not apply.

AFFIRMED in part, REVERSED in part and REMANDED.